Petitioner v. U.S. Nuclear Regulatory Commission and United States of America. Mr. Crowley for the petitioner, Mr. Averbach for the respondent. May I proceed? Thank you. May it please the Court. Steven Crowley on behalf of the petitioner of the Nuclear Energy Institute. I've asked to reserve two minutes of my time. Judge Millett, Judge Hillard, Judge Ginsburg, this is a straightforward case in light of three points that I think I can state very briefly. Point one, the Atomic Energy Act allows the NRC to enter into agreements with states whereby state regulators, instead of the commission, regulate land disposal of very low level nuclear waste. When the NRC discontinues its regulatory authority in this way, and discontinues is the word the act uses, the state, now called an agreement state, becomes the regulator, and the commission disavows authority over matters within the scope of such an agreement. Point two, many years ago, NEI's members obtained approval for their disposal of low level waste from agreement states under the auspices of these agreements entered into between those states and the NRC. Until 2018, these members in places like Texas, Arizona, Washington State, had no reason to doubt their state's regulatory authority over their land disposal of low level waste. And third and finally, in fact, these members had every reason to believe that their approvals from their agreement states governed the disposal of their waste. And here's why. Once the NRC discontinues regulatory authority through an agreement state agreement, it can reclaim or claw back that authority only by a rule, regulation, or order. That language, rule, regulation, or order, also are the words that the act uses, and those words are echoed in the AEA's implementing regulations as well. Well, what about 20.2002, which was on the books the entire time, and which clearly seemed to speak to what the NRC is now referring to as a kind of bifurcated responsibility, the responsibility of the generator of the waste to get approval for sending it, and the responsibility of the disposal facility as a disposal facility, which is regulated by, in their view, by the agreement state. And 20.2002 seems to speak only to the former, and it has been consistently on the books. So 20.2002 is not relevant to the regulatory framework that we're discussing, Your Honor. And here's why. 20.2002 is a sibling regulation, a companion of 10 CFR 150.10. It is that pathway, 10 CFR 150.10, that is the regulatory framework for agreement state agreements. And that's why the government consistently and correctly refers to or agreement state equivalents, or agreement state equivalents to 20.2002. 20.2002 provides for disposal where disposal is not otherwise provided for in this chapter, but disposal is otherwise provided for in this chapter. That is chapter one that governs the AEA through 150.10 and 150.15. Well, and this is a sort of fundamental difficulty that I have between your argument and the government's argument, which is that you persistently describe disposal as one thing, and the government is describing two different actions, that the generator has an obligation to, you know, package and transport and, you know, there's a getting it to the dump, if you will. And that, you know, as they as I read their understanding is that then the dump and whether the dump is like a safe place and whether it's supervised and whether it's leaking and whether it's, you know, off behind somebody's, you know, country house. You know, so and I just it feels like your ship's passing in the night on that issue. I don't think so. It's an important question. So thank you for it. And I want to I want to be clear what our argument is. So our argument is the NRC. We don't have a quarrel with much of with much of the government's position, just the core of its position. OK, we we recognize we don't we don't argue that the NRC has jurisdiction over the packaging of low level waste, the handling of it, the storage of it, the transportation of it. What it doesn't have is regulatory jurisdiction over putting the waste in the hole that they have given up. They have given that up by entering into agreements, state agreements. There is a there is and was a robust process for entering into those agreements. They are posted in the federal register. Public comment is invited. State regulators understand that they have authority. So so we are not with respect to, again, packaging, transportation, handling. That is NRC jurisdiction always has been, always will be. But with respect to disposal at the site, again, you know, turning the shovel over into the hole. That is the domain of state of state regulation, because so says the AEA and the agreements, the agreements, state agreements the government has entered into. I just want to clarify your argument is limited to in state disposal. Yes. Importantly, it's it's it's limited to in state disposal. Yes. So so it's a different ballgame if if we're talking about interstate disposal and that gets a little more complicated. And the NRC has provided guidance on various scenarios. If I'm taking disposal from one state to another state, we're talking here and and and as relevant to, again, Arizona and Texas. And of course, it was the enforcement action intrastate disposal in Texas that prompted this case. Except that the documents that are that are referred to going back to 86, 2012, 2016, 19, 19, none of those are actually making that distinction, except in in specific examples. But in terms of the regime, the regime is one that I think from NRC's perspective applies to intra and interstate. We would respectfully disagree with that, Your Honor. I mean, I'll let the NRC speak for itself. But just to back up a second, we have a framework that says states can approve of low level of land disposal of low level waste. Right. That that's that comes from the face of the act, provided that the state regulators enter into an agreement with the NRC and vice versa. And again, when when that happens, you know, there is a robust process to ensure that state regulation is up is up to stuff. What happened in 2012, as you mentioned, this document is because it was not crystal clear what is required in the multi state scenarios. The the NRC issued what it called a clarification letter, a clarification, not a disavowal of the of the framework. It wouldn't have had authority to disavow the framework, but a clarification letter that that spoke to different scenarios. Again, it gets a little complicated on the map, but depending on, you know, whether I'm in an agreement state or not and I'm disposing in an agreement state or not, we have no quarrel with the 2012 document that the court refers to. Likewise, we have no quarrel with the 2016 document that memorializes that clarification. Our, our beef is with the long standing authority of states to approve of disposal within their states. And, you know, even in 2012 when it when the NRC renewed Washington State's approval authority. Right. It did so recognizing the state's authority in this way. That's an addendum nine. You say you have no trouble with the 2016 regulatory issue summary, but had no reason to think that there was a change of position until 2019 but In 2016 the Commission clearly said that it was superseding the 1986 information notice and you know part of your Quibble is that there was no notice in common rulemaking, but that that ship has sailed. So, you know, as you're well aware, one of the questions is the timeliness question of any challenge. Given the clarity of the statement and I understand your position that it was unlawful for various procedural and substantive reasons, but given the clarity of the 2016 statement and, you know, why has that ship not sailed. Yes, thank you for the question. No, we strongly disagree that this is that this was clear and I want to, I want to say why It's important to be. It's important here to focus both on the words on the page and the context in which this this document was issued. So at JA 16 The, the, the, the, the, the regulatory this regulatory issue summary makes clear that there was an incorrect statement in the 1986 Information and that is a true statement. There was an incorrect statement. What was the incorrect statement. It was a global statement that states always have Approval over land disposal of low level waste and what this, this, this clarification that is referred to in JA 16 also JA 17 is to say that was an oversimplification. The Commission is saying we want to correct that oversimplification that overbroad statement. And we're correcting that by explaining that in a multi state scenario. Again, this is the language is important at the top of JA 17 Matters are different and we acknowledge that we had no no problem with that. Of course, the same the same document is very clear throated that it is does not Constitute a departure from the regulatory framework. It says that in JA 18 it says there's no notice and comment. We're not doing a back fit. We're not publishing it in the Federal Register. Nothing here to see. I see that my time's about to about to end. Right. To put to put it differently. Imagine had we tried to and we didn't have a beef with it. So we wouldn't have. But imagine just hypothetically the NEI, you know, sought to challenge this document. We wouldn't have been able to challenge it. Why? It says it's not it's it is simply memorializing the status quo. It is not changing the regulatory status quo. It doesn't require anything of license. You're a better lawyer than that. You don't take that at face value. If an agency says that and it's not the case, you would you would take it up and say that's not the case. Well, I want to say nothing to see here, but that may be part of what you would challenge. But but your honor, but there's no reason to think this wasn't the case. This on the face of it makes sense with the regime. Again, the NRC entered the NRC knows about these agreements. Right. It knows what state regulators are doing. It knows that that that NEI members are disposing pursuant of state authority. Under the EIA, if it's going to do something dramatically different, it has to say, OK, what should have this document said? It should have said we are hereby amending one fifty point ten. We are hereby changing the wording of one fifty fifteen. We're changing the wording of 2002. But but but our our position is there's there's a clear way to read this document consistent with those regulations as they are worded then and now. Well, so so what about the you know, what one way of reading them saying no back that needed strictly voluntary. This just ensures compliance with current regulations. And I gather this is the NRC position, although they can correct me. Is that they're saying, you know, twenty point two thousand two requires that even in an agreement state that the generator where it's a nuclear power plant has to get NRC permission to go with an alternative disposal site. And as we explained in the letter in 2012, we went through the five different scenarios and that included NRC regulated generator in agreement state. And even then the facility, the generator has to get NRC approval. So their view of nothing to see here is not that we're sticking with the 1986 regime. Their view is we're sticking with what we think we explained in 2012 and that we think is codified in and supported by twenty point two thousand two. Well, again, your honor, twenty two thousand two doesn't say that it's important to highlight the language here. So twenty two thousand and two references otherwise otherwise authorized in the regulations in this chapter. OK, so in other words, there is a door in twenty two thousand two that recognizes other sources of authorization. And again, that would be not otherwise authorized in the regulations to dispose of. And it's so again, this is about this is applied to generators, not to the disposal sites. And I'm just, you know, reading the government's brief and trying to get your best answer to it. That their view is that there's nothing else that authorizes a generator to dispose of in an alternative facility. The the the fifteen point one fifty point fifteen may authorize the site in an agreement state. It doesn't make that distinction, your honor. The regulation says any person. And again, for decades there, in fact, have been agreements between states and the NRC allowing for generators to dispose. That that is I don't think the government disputes that. So so there is a pathway for generators. There was never any distinction between generators and non generators. It's any person, nor is there any such distinction made in the act itself. Right. The act itself says, look, this is about state cooperation and enlisting states to do to do their part and have a say in the disposal of material that is very low risk. Because this is we're saying low level waste. It's a shorthand for very low level waste. So there's no there's no such distinction that has been drawn. And if there were, the NRC could not have entered into those agreements, state agreements in the first place. The NRC would not have said in 2012, the same the same year as this first clarification letter was issued, by the way, issued only to states, not to the regulated industry. Would not have acknowledged Washington state's ongoing supervisory authority, regulatory authority over this, over the disposal in that of a generator. It's important that that was in the context of renewing a generator's license. So so there was a very clear framework. There was a very clear regulatory before. And now there's a regulatory after. Right. And and there if the NRC wants to change its position, that's OK. But it needs to do so pursuant to rule regulation or order. Again, so says the Atomic Energy Act, the commission's own regulations, the APA. You know, this is this is this is ultimately about, you know, kind of due process small B. Mr. Crowley, I have a question. It's not an essay question. It's a multiple choice question. OK. What is it that you filed to review? You petitioned for us to review. What decision? Well, what anything did you ask us to review? We asked you to review something. I see. We asked you to review the NRC's determination that state approval is no longer sufficient for land disposal in order. What order did you ask us to review? Well, the that determination is what action I should take it back. It's an action. Yes. Well, it's the action. It's it's an action. Let's start. I'm sorry. I missed you. I missed your question. What is the date of the action? I don't know what we're talking about. The date of the action is September 2019 date date. Yes. No, that's a month. What's the date? Oh, it's the letter from the NRC. It's the letter. September 16. Yes. Thank you. That's a letter from the commission. Your petition letter asking them to rescind the IRS. Right. I'm sorry, Your Honor. No, that's the response letter to that letter. That's what I meant to say. Yes. OK, exactly. So you would see the predicate for their sending that letter on September 16. You would ask them to rescind the IRS. And the IRS is the 2016 document that Judge Clark's been talking about. Not exactly, Your Honor. Not exactly, Your Honor. That that letter, the September 16, 2019 letter was the culmination of a policy process that the NRC put in motion prompted by protesting a protest from South Texas. The facility that was cited. Yes, I understand that. Whereas I understand that you're saying the letter is the culmination of a series of actions. But the actions are, if I understand the letter, the actions are to to do something based on the 2016 document, the IRS, that you would like them to to repudiate. It's not the interpretation they would like to repudiate. Yes, that's an important distinction, Your Honor. Thank you. It's the interpretation. It's not the IRS on its face. Again, we had and have no quarrel with the IRS on its face. What happened? Yes. So it's important. It's important to draw the distinction between what the what the IRS says and how it has and how it was interpreted beginning in August 2018. Let me just quote one passage from the RIS of 2016. This RIS. Let's see. Wait a minute. I got it right here. It's on page 17. This RIS makes the clarification of any licensees request for approval to dispose of licensed material under 20.2002 or the equivalent agreements. Data regs must be submitted to the regulatory authority that issued the license for use of radioactive material. It's in the first full paragraph under summary edition. Second sentence. Third sentence. Now, that's what you're complaining about in the policy, you say, has been restated or somehow came to fruition only in 2019. Yes, Your Honor. That cryptic sentence cannot be that cryptic sentence contained in a document that says we are not changing the regulatory framework can't satisfy the APA, the AEA. OK, but as Chip Pollard pointed out, you might well have challenged it if you thought that. Now, there is an enforcement proceeding that's been filed. Correct. And I presume all of these arguments will be made there. It's not so easy as that, Your Honor. And the reason is, in this context, enforcement is a serious business. What's called a minor violation is quickly escalated to a major violation. It's not the industry's practice to say, oh, well, you can enforce against this and we'll, you know, we'll see you in court. I understand that that's not preferable, but that's where you are, where one of your members is, I guess. Well, but Your Honor, it's a circular argument we're responding to that the government's making here that we're going to take a sentence out of context, out of the larger document, it appears, and out of the larger regulatory framework understood by all parties and say, OK, this sentence, this sentence means something that it wasn't understood or didn't mean at the time. Why, why didn't, why wouldn't the sentence say, we are hereby amending 150.10? We are hereby abandoning the agreement state regime. That's not what, that's not what the risk says. Maybe they should have done that. Maybe they should have had rule and notice and comment rulemaking in 2016. Maybe they should have had a backfit analysis. They didn't do any of those things. And that may have been, may have been quite a faulty procedure, but you didn't challenge it. But now, reiterating it, you say, please say it ain't so, take it back. And they say, we're not taking it back. And you now try to say, we're not taking it back. We won't rescind it, to use the term you use, to make that into a reviewable event. I think, I think we didn't have, we didn't have a quarrel with this risk when it was written. Our quarrel is how it has been interpreted. And I can only imagine the government's argument. If we try to, if we try to challenge it. You didn't have a quarrel with how it was written. Yes. Did you consider it ambiguous or confusing? Yes, we considered it at the time. And then did you immediately follow up and say, wait, say the sentence Judge Ginsburg just read. Does that mean what we think it means? Or did you just sort of go with that? Well, our reading of this is, we're going to focus on the language we like. And say that this isn't meant to be a change. We're going to understand it this way. And hope that works. I'm trying to figure out, it seems like. I hear your question. Yes. Is that best, right, ambiguous as to what it was doing? I guess, I guess I want to say two things, Judge. First of all, at the most, this cryptic, now very pregnant sentence, right, that is going to be used outside of the broader regulatory framework. And this document taken as a whole and taken at face value. At the most, it might be, it might be read to say going forward. Indeed, the languages must be submitted on a going forward basis. That if there is a new, you know, a new generator or a new state or, you know, or a new facility that wants to do, you know, to seek, seek disposal, land disposal on a going forward basis, it would seek that from the NRC. We think this is unreasonable to say all existing agreements, state agreements, and the rule that they are more to and the statute that rule is more to are hereby wiped away. I mean, I'm having trouble with that. I still appreciate that there has not been model clarity and, you know, that there's been a little bit of a feeling of a kind of, you know, shell game of nothing to see here, nothing to see here, nothing to see here. And voila, at the end of the day, it's a different regime from the one that there was in, in 86. On the other hand, this, at JA 17 where Judge Ginsburg was reading, it follows that sentence for NRC issued licenses, the request should be made in accordance with the provisions that talk about communicating with the Commission. For agreement state licenses, the request should be made directly to the agreement state. So it feels, I mean, I may be missing something, but it seems to be saying you're hobnobbing with the agreement state, your approval from the agreement state is not enough. Maybe on a going forward basis, but how could, how could this document... I can see how at the time you might read it that way or think of it that way, perhaps reasonably, perhaps not. I just have to be much more familiar with the context. But then, then the Commission said to South Texas in 2018, some point 2018, that this is a problem. South Texas, you haven't been complying with this. And then in August of 2018, South Texas asked for clarification, right? The NRC affirmed its position, but declined to enforce. That was October 18. You know the situation now. Oh, absolutely. What did you hear before there was a document that you thought to characterize as final agency action? Absolutely, absolutely, Your Honor. In 2018, to South Texas' surprise, the government relied on this document, apparently so. I mean, this became clear over time. But there's this back and forth, and South Texas' response is revealing. It said, you can't mean, you can't mean this 2016 risk calls into question our existing longstanding approval from the state of Texas. It was that surprise. The Commission came and said, yes, that's exactly what we mean, but we're not going to enforce. We would disagree. Not exactly, Your Honor. To its credit, the government said, we'll rethink this. It's important, the government said, you're right, you have raised genuine questions about the clarity of the risk. We are going to hold a public meeting. We are going to take some comment. We are going to I don't think that was in the answer to South Texas, was it? That came later, I believe. No, both, Your Honor. At JA32, the exact language was, the NRC said, we are going to evaluate this issue generically to provide further clarity. So the government is conceding there is not clarity. One could, to be fair, read that as enforcement clarity, that they realize that with a shift and with whatever the practices are, that there's some question about how quickly and in what circumstances people have to come into compliance. May I respectfully disagree? For you to point out to an agency, as many, this can happen, I readily imagine, with other agencies. Say it ain't so, you can't mean it. There's this huge reliance interest. And the agency might say, well, we do mean it. We haven't thought about the reliance interest. We'll think about that now, too. All of the above. What actually happened? Let me make sure I'm responding to both of your questions, which I think is a version of the same question, but you'll correct me if I'm wrong. South Texas protested. The agency said, you're right. We will provide further clarity. You have raised legitimate issues. You have caused us to evaluate the risk. That's what they said, to evaluate the risk. At JA48, there's a meeting notice. What does it say? I'm quoting, discuss a path forward to address concerns with the risk. And lastly, importantly, JA54, 55, 56, summaries of those meetings. And the language makes clear, the agency, look, even if you think, which we strongly disagree with, that we could have sued on the basis of the 26, but even if the court were to conclude that, the agency reopened a policy process, ran a policy process to consider revisiting the risk. We know that that's not how they characterize it. They characterize it as information sessions and trying to be transparent and respond to the outcry, but not reopening a policy process. Well, I don't want to quibble over words, Judge Pillard, but what they said is, we're going to evaluate the issue generically and discuss a path forward to address concerns with the risk. I think, I mean, any reasonable, let me just back up, any reasonable. I'm sorry, I don't see them saying, first you said that they're going to reevaluate the risk and I don't see that in their letter. And then now you just said what they said, they evaluate the issue generically to provide further clarity. I don't see them saying anywhere that we're reevaluating the risk itself. So, I'm looking at JA-32, the last, well, the only full paragraph at JA-32, the second sentence, the NRC is evaluating the issue generically to provide further clarity. Right. Yes, but in the previous page, they had said... Further up in that, yeah, go ahead, Doug. I'm sorry, they had said at the bottom of the penultimate paragraph, however, NRC authorization for South Texas to use these sites for this material is also required. Okay, so, I mean, they're adhering to their position in regards to this particular enforcement action. Yes, we agree. We raised some issues and we will think about those, but they're not in this case. Well, they're sticking to their position, we agree, but they're also... This is to the government's credit. They're also saying to its credit, like, you've raised some issues, we will work through them. I mean, the alternative is, okay, the whole industry is asleep at the switch. Every generator in the agreement state is asleep at the switch. Every state regulator is asleep at the switch. Again, this is regulation by gotcha. That's not what the AEA prescribes. The AEA prescribes, the APA requires some process, some transparency, some notice. Give the industry a chance to weigh in. You can't put one sentence in a document that says, this does not disturb the... That sounds like a great challenge on the merits to the agency's decision. What we have to decide first and foremost, though, is when was that decision made? It was made sometime between August 2018 and... That's an action that you're challenging and you have to have a date. Yes. And so sometime between 2016, then you probably should have started in 2016 with a challenge and then everything could have gotten cleared up quickly. You said between 2018. The commencement of the enforcement when the commission signaled, okay, maybe we got ahead of our speeds. And yeah, the decision, the embodiment of the determination, the order for the Hobbs Act purposes is the letter response to the industry. That letter, by the way, was foreshadowed in the public meeting. They said, okay, we hear you. We will get back to you. I'm paraphrasing, but not loosely. We expect by the end of September to respond to industry's concerns. So naturally the NRC sends an authoritative letter to the industry's group, my client, the petitioner, and says, here's our answer. So that easily satisfies Hobbs Act. There's lots of circuit law on a letter from an authoritative agency official that constitutes the culmination of an agency process is a Hobbs Act order. Actually, the principal case you cited for that also had an enforcement letter. I think it was Barrick. Barrick, yes. Appalachian Power. Yeah. I wondered about why, Mr. Coley, the Institute didn't just seek a rulemaking, just petition for rulemaking, because wouldn't you have clear, I mean, couldn't you still do that? You have clear avenue for review from a denial of a petition to make the rule that you think you thought was in place. The agency denies that, and then off you go to court. It sounds simple, Judge Billard, but in the meantime, there are enforcement risks. They are expensive. They raise reporting requirements. They implicate insurance arrangements. So the rulemaking process, even a pretty quick one, as the court's well aware, that is not a healing avenue. I think you're right. As a formal technical matter, that has not been precluded. But the fact remains, we have a decision, an order, a decision, and the agency has articulated a viewpoint that's inconsistent with the procedural requirements of the Atomic Energy Act. Run a process. Give us a say. Do something transparent, not this regulatory gotcha. Coley, do you have any further questions? Not now. We'll give you some time. Thank you. Mr. Averbach. Good morning, Your Honors. May please support Andrew Averbach from the U.S. Nuclear Regulatory Commission on behalf of the United States and the NRC. This petition for review challenges the NRC's determination in 2019 not to rescind at NEI's request an interpretation of its regulatory authority that the agency staff formally announced in 2016, and it has in fact been articulated as far back as 2012. I have to confess that I was somewhat surprised to hear from NEI's counsel that they actually have no quarrel with either the 2016 or the, I'm sorry, the 2012 or the 2016 guidance. The fact of the matter is that those are mere interpretive rules that the staff. Is the decision not to rescind your position of final agency action? You just said they asked you to rescind it and you said no. Well, that's what they've identified in their petition. I'm asking you as a decision not to rescind a reviewable action under the hotfix. If it had appreciable legal consequences, it could constitute final agency action that's reviewable. It certainly does have appreciable legal consequences. That means they now, they're clear and they have to go for, the industry, industry-wide has to go forward now and change their application processes for a reviewable action. And that's a dramatic way that they hadn't before. Well, that's what they say now. And they somehow suggested that they were somehow eliminated in that regard by virtue of the 2019 letter. But I point the court. Decision not to rescind. Decision not to rescind. Yes. Wait, sure. Yes. So they've identified harms. I didn't hear you in your brief saying those are not appreciable legal consequences. Well, I want to make clear that as an initial matter, any appreciable legal consequences that may result from the agency's interpretation don't come from the 2019 letter. And in fact, I would draw the court's attention to J42, which was the letter that NEI wrote to the NRC after this sequence of events that Mr. Crowley described. And the position that NEI is adopting here, this sudden illumination that, oh, my gosh, now licensees who had previously existing arrangements are now going to have to comply with NRC requirements. NEI acknowledged that very circumstance back in February 28th, 2019. And this is on the bottom of page JA42. And it wrote, quote, the changed interpretation provided in the risk information summary requires, they actually emphasize the word requires licensees that have obtained approval from the agreement state for alternate disposal of LLW to obtain approval from the NRC prior to continuing such disposals or risk information. That was based not on the risk itself, but on the subsequent enforcement action against South Texas. So. I mean, the statement says the chain, I'm sorry, it says the changed interpretation provided in the risk. So they fully understood the consequence of the, of the risk. I don't, I think, I think we just need to stop and be fair here. Okay. Let's just be fair all around. I understand your arguments about that. Did you just. That prior to 2016. The longstanding established practice. Was that the agreement state provided the approval. Assuming it's in the same state. That's all I'm talking about. The agreement state provided the approval for disposal of low-level waste. Do you dispute that? I dispute that in as much as it suggests that it was prior to 2016. In 2012, the agency. No, no, that was about interstate quite clearly. Well, let me. You had guys, you guys issued guidance in 2009. On low-level waste disposal processes. And that guidance said. Okay. For reactor licensees submitting 20.2. To request. If both the reactor and the proposed disposal facility are located in the same agreement. States. Typically the state regulator would perform the review of the request. Not NRC staff. That's your 2009 guidance. So let's start with that question. As of 2009. Was the practice. That the agreement state provided the approval and not the NRC. I would say that in certain, some circumstances. That was the case. Tell me what language in this. Your guidance. Well, what I'm. What I'm trying to suggest is that candidly, there was a bit of a mess. And I don't, I don't deny that, but we've cited to two different. Federal register notices reflecting. Licensees. In agreement states. Seeking NRC approval. Prior to 2012. I don't recall the exact date. So I believe when it was 2010, when it was 2005. And going. I'm sorry. You out of how many. I don't know the denominator in that. Right. More than two. It was more than two. We pointed to those two because they were published in the court. So, all right. And you just said at best, you had a mess. You had a 1986. I forget all these different names you have for these things, but a 1986 notice. Right. And. And then you had in the late 1980s. Proposed. Regulatory amendment that would do exactly what you now say the risk did and was withdrawn. And then you had this 2012 letter that comes along. We got the 2009 guidance, which. I don't think has been replaced until. Your 2020 guidance. Unless you can tell me you've had intervening guidance that changed that language and says the states are going to do it. Generally. No, your honor, we, we embarked. I'm sorry. That was the guidance that they had. They were going to do it. So you had conflicting stuff all over the place. You had tried a regulation and then withdrawn it to make this very change. And then you, and you have a 2012 letter that's talking really, at least as I read it most fairly about interstate, which is why I limited my questions. And then you've got this risk, which has language that's been quoted that seems to say we're changing our position, but. For an agency that has said, we're going to try to do it for regulation. And we were withdrawing that and we need to do a regulation. And now to have this in the risk. Industry is confused. You might be right. You might be wrong. That's a merit issue. And then you have the NRC.  That's talking about whether the 2016 risks. Lawfully accomplished that change. And you've got language in there that seems to announce the change. But this seems. Rather it seems rather odd to me that on issue. It's important. The NRC. Buried such a massive change. In a sentence. In an issue statement.   Is going to do a regulation. Rather than a regulation. And then add to that very issue statement. Compliance with current regulations is strictly voluntary. The compliance of the risk and sure. It'll be strictly voluntary. On page. I can't blame them for being entirely confused. I mean, does the NRC at least acknowledge. This is not good government. How this has been done. You are. There are a number. Voluntary. What we meant. Voluntary. Okay. I'll start with that. When the agency said it was strictly voluntarily. It was referring to was the fact that 22,001. The NRC. Sets forth a series of different ways in which a. NRC licensee. Can dispose of low-level waste. One of which is to deliver to an authorized recipient under 22,001. A one. Then there's a list one and one. And there are several enumerated or enumerated methods. That have been approved through notice and comment rulemaking. The sort of. Safety valve. If you will. Well. And any action. Any action that licensees take to implement. Changes or procedures in accordance with the information contained in. This risk. Insurance compliance with current regulations is strictly. And strictly voluntary. If I may finish. When it says it's strictly voluntary. What it's saying is you don't have to capitalize on. It's 22,002 safety valve. You can use any of the things that the agency has previously evaluated. You can use any of the things that the agency has previously evaluated. Through notice. That's. That's just not what it says at all. But the point. Get out of the back fitting. This is all to get out of that. You wouldn't have back. We wouldn't have any back. And obligation that they were just going to use already approved. Forms of disposal. The only reason you're talking about. Something must've changed. Or someone might think something changed. Well, right. And that's why at the beginning of that document. The regulatory information summary. The agency made clear that it was rescinding. The prior guidance that it was incorrect. And it was superseding the entirety of that document. And this attempt to sort of refashion it is only partial repeat. A partial superseding or partial. Repeal of the prior guidance. I think it isn't a fair characterization of what happened. The agency recognized. That it provided inaccurate guidance and confusing guidance in the past. It endeavored in 2012. And then in 2016. To replace that guidance with. Something that was true. I don't think there's any way to say that you endeavor to be open, clear and transparent. In 2016, because you were. You know, coming and going in the same document. I respectfully disagree with that. But I certainly. I think that as I made clear when I decided to pay a 42. I understood the consequences of what had been done. In 2016. When it said this new regulatory information summary requires. It's language. Our licensees who have these preexisting. Arrangements. It's informational. And pertains to a staff position. That does not represent a departure from current regulatory requirements and practice. It says that your honor. And two points about that. Number one. The current regulatory practice was based on the 20 to 12, 20. 2012. About interstate. In state. If I may, your honor. Some of the. I believe the first scenario in the 20 to 12 letter actually referenced and interstate. The interstate. Situation. So while that was. What was being discussed. And I think this is, this is an important point here. We're not focused. The regulatory, the regulation. And the statute, the regulatory basis for the agency's position doesn't depend on whether or not we're in an interstate or in. Trust states. To discern this from a letter that wasn't. I'm sorry. You're right. You're, you're, you're, you're. Regulate your, the regulated parties here. We're supposed to discern from a scenario. In a letter. To state. Not to them. That was never published. Well, you know, that's fine. When you're saying the change happened in scenario. Or that's how you openly and clearly and transparently change. Well, you're. Without bothering to change your guidance. If I may, your honor. There was continuing ambiguity post 2012, which is why the agency further attempted to clarify the record in 2016. There was continuing ambiguity. Between 2012 and 2016. Then the current state would have been. Ambiguity and would have included. I think. Countless. Maybe not all, maybe there were two exceptions. But there would have been countless. Plants that were. Relying on their agreement states to approve low level waste. Would you agree with me that that was the state of practice? Up to 2016. That that was going on. I. Certainly the three. Licensees that NEI has provided. Affidavits from work subject to that. I'm not aware of there being any more. How many applications. Did NRC get between 2012 and 2016? To approve low level waste. In an agreement state. I don't know the answer to that. But what I do know. You were getting flooded with them. You would have known that. Well, I can't suggest to you that we were getting flooded with them. And your guidance at the time told him, don't bother coming to us. It's not for NRC staff. Right. Which is why we endeavor to provide further guidance in 2016. And to remove, remove any existing confusion that may, may have continued. To exist. I want it to make the fundamental. I think this was the clearest. You could have said it. I suppose. Regulatory practice. Practice. I'm not departing from current practice. If I were to go back. Five years in time. Perhaps I would have written it differently. But what we're talking about here is. A position that any I understood. That any I. Understood the consequences of, and that fundamentally. Let's not put words in your. Your friend's mouth there. Didn't understand the consequences at least before. The 2018 enforcement. Well. Okay. I don't know. Texas was surprised. It may well have been, I don't know. So much for your. Can I ask a slightly different question? Which is, you know, I think in your brief at an abstract level, you do. Helpful job of distinguishing. Between what's involved in regulatory approval on the sending generator side and the regulatory approval of the receiving disposal facility. Side. I mean, it seems to me that that's fundamental to your. Position that there there, these are two separate functions, or at least can be. And in the view of the commission, it's important to when. NRC license generators are involved. It's important to keep them separate and that the. The sending side just for shorthand is not delegated to agreement states. So. I understand that in a, in a, in a sort of abstract sense. And, you know, I'm not for its part, the institute refers to the commission's. New interpretation requiring duplicative NRC. Approval. And then I thought it was very helpful. I'm not sure if there's a, All Mr. Crawley today said all. He's concerned about is the. What I refer to for short and as the dump, you know, putting this stuff in the ground. Can you just, in, In somewhat more concrete terms, explain. What the distinct inquiries are. You know, where, where under the 2016 regime. Where the NRC is looking at. The generators. The NRC is looking at. Permission. To use an alternate site. And the agreement state is looking at the alternate sites. Eligibility. What are they, what's going on? What are they regulating? What are they looking at? How do they differ? Interesting in a really. Functional practical. Okay. I'll start with the proposition that the NRC is not regulating. What. The owner refers to as the dump. That is not an NRC licensee. At least in agreement states. And so. The NRC. Isn't somehow taking away jurisdiction from agreement states. To regulate the place of the dump. The, the actual. Depositing of the material into the ground. Those are all decisions that the states remain free. To make consistent. Not the. Putting it in, not the lining, not the. Supervision of it. Not the freedom or not from water. Like, so. Those continue to be within the state. But what the NRC. I'm sorry to interrupt you. No, no, no. I interrupted you. I just. What I'm trying to get at is. This idea that. Under 10 CFR part 20. Which is applicable to all NRC licensees, including those. Who are licensed under part 50. 50 being the one where all the nuclear power plants have received. Licenses in the NRC. Part 20 requires. Requires NRC licensees, including nuclear power plants. To submit a plan for procedures to be employed. For the sort of post handoff. Disposal of. Low level waste. And the reason for that is that. The NRC doesn't want material transported off site without. Understanding that there is a plan. That has been previously evaluated and approved. By the NRC, either through notice and comment rulemaking. Or through at least understanding what the plan is. The NRC wants to make sure that. To procedures, you refer to packaging and transportation. You refer to the method by which they seek to dispose. You refer to the handling of waste. Before it becomes subject to agreement, say authority. And you distinguish between the disposal method and the disposal itself. So what is in the former category and all of those diets, what is the. Procedures that the NRC. Needs to. Supervise. Before the low level radioactive waste. Is at the dump. Well, the NRC has to understand what the radioactive dose of the waste is. It needs to understand. The time it's going to take. For. For this material to. To actually be disposed of as a phone. Which will dictate in turn. How much exposure. Employees or the public may have. Two to this waste. It needs to understand. You mean in transit. Are you talking about in transit or at the dump itself? In transit and up to the point where. It is accepted for disposal. Okay. It's transit, but it all. Keep in mind that we're going back. Already regulated. It is. Packaging already regulated. Sure. But this is part of the NRC is what it refers to as its defense in depth. Approach to making sure that. It's not. All the I's are dotted and P's are crossed. I'm very simple. So I've got a barrel of this. Very low level waste. Sitting on my nuclear plant. And I've done everything lawfully and packaging it up consistent with regulations and it qualifies as low level waste. There's no dispute about that. And so. I'm using. And that sort of packaging. The definition of low level waste is already addressed. I've been resolved. The packaging is compliant with existing regulations. I'm using an approved transportation system. To the dump. So tell me exactly what it is that you're regulating under. Are you asking them to. I'm really confused. Are you asking them to document that they've. That it's low level ways to document that they're using the right container to document that they're doing the right transportation. It's just a document. Documenting the regulations you already impose. Or is there something. Else when it goes on. The NRC approved trucks and those drives in the NRC approved way to this. Agreement state approved. Dump. Well, we want to understand what they're going to do with it. Once it gets to the dump, for example, are they going to open? This is where I'm very confused. So I thought you said once it gets to the dump, the state takes it. I'm sorry. Just so that I'm going to jump in your question. I'm very confused. What does it mean when it gets to the dump? I thought you said the state took care of that. The state regulates that certainly the NRC has a, has a role to understand what exactly is going to happen. And it's within it. At the dump. Yes. And again, it's not. You already cleared all that when you agree, when you, when you license. Someone to be an agreement state. Don't you go through all that already? When we licensed someone to, to be in agreement. For lack of putting aside the nomenclature essentially. Yes. But we as part 20 licensees, And this is part of the legislative rules that are in place that all NRC licensees must comply with. They still need to comply with 22,002. So that the NRC. Before it just simply authorizes ways to be driven off to some. Some. Language keeps changing. I don't, I don't want to talk about it. I don't want to talk about it in state. Don't get me out. Okay. I don't want to. I didn't mean to call our position applies in state and not. So on in state. I don't know what procedures you're. Regulating because you said it's not at the dump. It's the inner it's the. The plants procedures and getting the stuff to the dump, but then your answers have been all about. Well, what's the dump going to do with it? But, but that's what you said. The state. Regulating and you are not. Policing. So you can understand why industry is profoundly confused here. I can understand. I can understand. Their reluctance to be subject to dual regulation. Respectfully. I don't think that that's what's going on here. The agency is simply saying. Look before we can authorize anything to leave a site and whether it goes in state or out of state. We want to understand what you plan to do with it. And we want to understand. Agreement state approved. Has there been any. Has there been a problem that they haven't been taking it to state? No, but. What they said they would do at their disposal site. Well, we have. I can't speak. There's been an individual problem or not, but I'd like to attribute the lack of problems to the fact that we have regulatory requirements in place. Saying, Hey, look. Compliance manual didn't require any of this. So it hasn't been done before. Maybe 2018. Well, I don't think that that's a bad thing. 2016. To improve our processes. I don't think that that's it. That's a bad thing. I'm sorry. I still don't. I don't understand with my barrel. What it is that you're approving. Under. 22,002. What is it that there's. That you are approving. That you haven't already approved. By authorizing the agreement state to handle the disposal stage. Well, the point is that all of the other. Methods in 2000, 20, 2001. Have been approved by the agency. Three notice in common and rulemaking. When a licensee tries to use the safety valve at 22,002. I don't think that that's a bad thing. This is something that the NRC won't have previously considered. And the agency is simply saying, just like all the other provisions. Then you consider it. When you. Agreed with. Agreement state. That they're in charge of disposal. Are you. I guess I thought you told judge Miller that you were not. Regulating. The disposal site, but that was for the state. We are not, but we want to understand. What is going to be done? What is proposed to be done? By the way. I'd like to see at the disposal site. Yes. What do they do? Information as opposed to regulation. It's saying before we sign off on our. I'm sorry. Before we sign off on the, the. Facilities in our primary regulatory and that before we sign off on them, passing this off. To a state supervised dump. We want some communication about why the state is satisfied. That this is going to be secure. I think that. Some of the information that they're in charge of, I think that's a fair characterization. I mean, by who? By the generators. I understand it. Can I ask you on, on the. I'm sorry. Wait, I'm sorry. Are you talking about timing? How long it takes. When it's going to happen. How long it's going to take. I'm sorry. I'm getting confused. The amount of time. To which. The amount of time. That the material might be exposed to the air, things like that. That's okay. So the amount of time exposed to the air, you mean in the transportation process or do you mean in the dump? I mean, in the dump, but I also mean how long it's going to take to transport it from point A to point B. Things like that, which have to be. You are regulating the dumps now too. I wouldn't, I wouldn't suggest that. We want to understand what's happening before we authorize shipment offsite. And to, and frankly, to, if necessary, communicate with the state authorities to make sure that we're all on the same page. No, how long. The people operating the disposal site. Take to. Dispose of it. Procedures would. Information. Or when something's going to happen. Sure. Wouldn't the state have that information? They're the one that licensed the disposal time. I don't. There have to be procedures. And to be clear. There are the. The facility, the disposal facility is licensed by the state. But they don't necessarily know what their. What their intent is.  And they don't know how their customers. For lack of a better word. How they necessarily intend. To to operate and there's a. Okay. So what you're addressing here is a problem that states are not. Policing their disposal sites. Well enough. And so you want information from. The plan. About. How the, how the disposal site. The disposal site. Licensed by the state in an agreement. Stage. Is actually doing it. I wouldn't characterize it as the agency. Addressing a problem. I think it's preventing a problem. So that it understands what is going to happen to this waste. At the disposal site. Yes. At the disposal site. Okay. Okay. So I just feel like I interrupted you. I apologize. So. What's your response to Mr. Crowley's. Point I had taken you to be relying really quite significantly on 20.2002. And Mr. Crowley says, well, that's only half the story that really doesn't apply here at all. What we're really, I think if I'm remembering correctly, he said, well, we're really looking at here is. One 50.15. And I had read that as actually not exempting this activity, but I'm. I'm a bit of a novice in this area. So can you explain why you think. That his answer is not. Problematic from your perspective. Yes. And I actually, I'm glad. I'm glad the court raised that because that's an issue I would like to address. I don't think it's correct to say that. NRC licensees. Are exempt. Pursuant to. Let me begin that sentence again. I don't think it's correct to say that. Any NRC licensee is exempt from NRC regulations. And that's effectively the import of Mr. Crowley's argument about one 50.10. And in particular nuclear power plant licensees, which is what we're talking about here. Actually don't fall within the scope of the one 50.10 exemption because they will necessarily. And I'm quoting here from one 50.10. They will possess special nuclear material in quantities. It says here, not sufficient. The people who get them are not the ones who have it. Not sufficient to form a critical mass. Nuclear power plants have. Especially nuclear material in quantities sufficient to form a critical mass. And what that means is that they're not somehow exempt from. NRC requirements. And what that further means is that they are therefore subject to all of the requirements set forth in 10 CFR part 20, including the need to comply. Should they choose voluntarily to pursue an alternate means of disposal? The requirements of 20.2002. And so. There's no need for the agency to somehow claw back jurisdiction over nuclear power plants, nuclear power. Are subject to NRC regulation. I'm sorry. Yeah. Sorry. I was just going to say, I had, I gather incorrectly referred to one. I think Mr. Curly mentioned both one 50.10 and one 50.15. And is the waste we're talking about here covered in one 50.15. Non-exempt specifically. I mean, a four or. Okay. We're not invoking the clawback provisions of one 50. A four. But to be perfectly clear here. We don't feel the need to somehow suggest that. That. The disposal of waste is part and parcel of. A power plant operations. It's. The need to comply with part 20 exists, irrespective of someone is. Or is not. Is there is not a power plant. The need to comply with part 20 stems from the fact that you as an NRC licensee. And someone who is not exempt. Under one 50.10. And the need to comply with all applicable provisions of. 10 CFR, including 10 CFR. 2001 and 2002 and 10. To really drive it home. 10 CFR 2001 says. A licensee meaning. Any kind of NRC licensee, including a nuclear power plant licensee. Shall dispose of waste. Only it says. In accordance with any of the enumerated methods. Of disposal of waste. One of which happens to be 20, 2002. But. NRC licensee is bound by that provision. And that provision. One of those approved methods. Going operating within an agreement. Is an approved method of disposal. They can do. That's for. Only. The agreement state. Provisions. I'm not sure if that's fair. I don't think it's fair to say that. You know, low level. Low risk. Material. Anything that's remotely risky goes out of your hand. I don't think that's the point of your question, but I, I'm not sure that that's. A fair characterization. No, please. I don't think it's fair to say that. That. The mere fact that it's low level waste doesn't mean that there are non-hazards associated with it. I didn't say that at all. I just said that the agreement state program, as I understand it, is the only thing. As to which the NRC will in the NRC is word. Discontinue. It's regulatory. Regulatory authority is. Testified. Low level. Risk aspects of nuclear power. Production. Right. Okay. And discontinue is the NRC is word. Correct. Discontinue regulatory authority as just to those aspects. Is that correct? That is correct. And that's why. Disposal. Allow an agreement state. Consistent with your 2009 guidance. I'm sorry. Which has been in existence at least till 2020. Allowing the agreement states to approve the disposal. In land. Low level. Radioactive waste. In state. Yes, your honor. And that's. I, I, I, I, I don't, I don't think I'm disagreeing with you. When I say that the agency has not. Undermined. Or prevented states from maintaining. Full authority. I was responding to your argument that you hadn't given up any regulatory authority and you weren't calling anything back, but then your own verb is just. And you. Regular. Very narrow, but just continue. You were. You sounded to me like. Like you were. The sense in which. The sense in which the NRCs authority is discontinued means that it does not regulate the recipients of nuclear waste. The facilities at which. 2009 guidance. Well. Approval of. 22. 22,002 requests. The state regular. Perform the review of the request and not NRC staff for reactor licenses. Well, again. The disposal plan. For reactor licenses, submitting 20.202 requests. The. Facility are in the same state and the same agreement. The state. The state regulator will perform the review. Well, that's why the agency endeavor to correct that. Your honor, which is. 2000. So last year. Well, right. That's why in fact, the agency responded. To. The. Both any eye into South Texas and said we are endeavoring to provide additional guidance as to what to do. Having recognized that the prior guidance. Had not necessarily. Provided all the accurate information. Now. That's not what's what's at issue anymore, though. What's at issue.  I think what's at issue right now is whether or not in 2019, when it said no, our interpretation of our own legislative rule. Is is correct. Whether or not that constitutes final agency action. But one other thing too, when I know. Texas. And there was a statement there that you would, because of all the confusion would exercise enforcement discretion. And so. Does that mean when you exercise enforcement discretion, I assume that means there's not going to be any kind of. Penalty or ride up, but does that, I assume they still are expected to come into compliance going forward. Well, what the letter to South Texas. Said was. We won't. We won't. Seek. Any kind of enforcement for past conduct. And until we put forward this guidance. We won't likewise. We'll allow you to permit to continue to dispose of waste in accordance with the existing arrangement with the state of Texas. The implication I think from that letter is after the issuance of guidance, now you've got to comply. Okay. Oh, okay. So then there wasn't actually a regime. Requiring them to change their behavior. Until. The guidance issue. So in 2018, they didn't even, they still didn't even have to change. Was it just South Texas or all of them? It wasn't expected. For in-state disposal wasn't expected. To change until you had the new guy. After meeting and everything. We expected it. The licensees to comply and really the guidance. And the specific thing that. Well, One of the specific things we wanted to address with respect to licensees like South Texas was what to do with licensees like South Texas that had in fact, Previously obtained an off. And. From, from the state. We've been notified about three. And I have to confess that one of them we learned about through this litigation. Meaning Arizona. But the remaining licensees. Have been aware of this obligation since 2016, at least. I think as we pointed out before, they didn't sue. And in fact, what I've heard is that they actually don't disagree with the underlying. Logic of the agency's position. And I think it is correct to say that. Had they disagreed with it, we, we probably would have been in court. It's strange to me that. Here we are three years after the issuance of the 2016 regulatory information summary. The NEI. Is. Is advancing the interests of three of its members. When it actually. And. Notice. Violation was the existence of violations communicated to energy Northwest. And I think it was 2019. And that's referenced in the briefs. To my knowledge, that's the only one. So. Zooming back and looking at this. At a much more simple level. The, the commission has acknowledged that it's interpretation of. 20.2. Has shifted at least. From the interpretation and that's in 19 in the 1986 information notice, which it refers to in the. In a 2016 regulatory summary is incorrect. But at the same time, the commission has said that none of the particular communications. Has created a new legal obligations for NRC licensees. And is that because no enforcement action has yet. Been taken. Or what? I mean, it seems like it's the interpretation. Has shifted. There is a new legal obligation. And when and how. Did that crystallize. I think the clearest answer I can pose to that. I think the clearest answer I can put to that. Question is that. The obligation itself doesn't stem from the NRC staff's interpretation of the regulation. It certainly. If licensees voluntarily choose to comply. That's. Their own decision. The obligation stems from the regulation, but. The agency had an authoritative interpretation of the regulation in 86. That it didn't. Apply to. In a way that you've now said it does. Now, meaning between sometime between. Yeah. 12 and now. Yes, I agree with that. And so the question is given that, I mean, maybe the position is, well, the. The, I gather the position is that the 1986 interpretation was wrong. Invalid. But nonetheless, it was something that had some operative force. And so if there's a change, what's, what's. Really confounding is that. The agency has both said, yes. We've changed. Our interpretation. But at the same time, it said. Nothing to see here in 12 and 16. In 18 and 19. And the nature of the nothing to see here has shifted, but it's sort of like, when. When did the agency say, okay. Rubber's hit the road here. Folks. You know, let's bracket the enforcement issue, but you've got to do this. Like, is that, has that yet been done? Well, I think the 2016 information summary. Accomplishes that task. Okay. I'm going to jump in here. When it says that NRC licensees as distinct from agreement, state licensees have to go to the NRC in accordance with 20, 2001 and 22,002. In order to get approval for alternate disposal. Methods. I understand that we communicated. The NRC. I think had a sense that this was public knowledge in 2012. I understand. The NRC. I think. Judgment led concern that perhaps it could have been stated more clearly and more expansively to both interest state and interstate. Situations. Client might've had an opportunity to say, okay, you should have done a back fit or you should have done those in common or whatever. But that's time-barred in your view. Yes, I would agree with that. Now there are certainly other opportunities for, for those particular clients to contest the agency's interpretation or to seek judicial review, but it's, it's odd here to write a letter to the NRC in 2019 and have us simply say, no, we meant what we said in 2016. And to have that suddenly be the, the impetus for judicial review under the Hobbs act. And I want to make, I want to emphasize this too, because the Hobbs act has specific qualifications on what this court is empowered to hear that tie back to section one 89, a of the atomic energy. And in particular, the only operative, the only Avenue that NEI could get this court's jurisdiction right now is if what is reviewing is a rule, a final order in a rulemaking proceeding. And I, I understand that the court has said that, okay, when the NRC issues a legislative rule, that those legislative rules fall within the meaning of the final order in the section one 89 proceeding, but all the agency has done here is adhere to a previously existing interpretive rule. And. Under that period, we're challenged to the 2016 RAS will qualify for Hobbs after you said you're just, that was just in here in 2012. So that would have challenged the 2016. All right. The agency's position on the government's position is that an interpretive rule is not recognizable in a, in a Hobbs act proceeding. I want to make sure. I just want a yes or no answer. What a challenge to the 2016 RIN have qualified for Hobbs act review. I don't think it would, but I want to, I want to qualify under the Hobbs act. In my view. Yes. I do want to just make this qualification though, that there is a case for 1982 entitled new England power company versus NRC, which purported to challenge what it called an interpretive rule. Didn't really assess jurisdiction, but when one does a search of previous cases, it is in fact, analyzing an interpretive rule. I don't think that's proper under the Hobbs act and the third circuit is held otherwise in the case of New Jersey versus NRC. But I think that the, just to be clear that the agency's commit position is that only, the only way to challenge this change, I think would be through an actual enforcement proceeding. Is that right? And enforcement proceeding, the court referenced the petition for rulemaking, which is an avenue to. I don't disagree that, that the standard of review. Right. I just want to be clear that your position, cause I hadn't misunderstood from your brief. I had thought you said they should have challenged the 2016 RIS. And now I understand you've clarified for me. Thank you. That, that you don't think that could have been challenged either. I'm going to make sure I'm not caught up with this. So you're saying the only things that are challengeable are a product of notice and comment rulemaking or the final order in an enforcement proceeding. In this particular context. Yes, certainly in adjudicatory decisions that the agency makes, which we see all the time, and licensing proceedings are subject to Hobbs Act review as well. But the judicial review provisions under section 189B of the Hobbs Act are tied back to that, which is set forth in section 189A. And section 189A is limited to proceedings of three or four different types. One of which is a final order in a proceeding, issuing or modifying a rule or regulation. And the word is the language that the act uses is dealing with the activities of the licensees. So a final order in a rulemaking proceeding, and which I think is appropriately read to include legislative rules like 2001 or 2002, but not interpretive rules will be reviewable as it would be a denial of liability.  reviewing a petition for rulemaking? Right. Just one question coming out of an adjudication. Yes. Why does everything take so long? Can the court be more specific? There's a reference to each of the, each of the communications to the regulated community and to the states and the agency sort of hopefully says, Oh, but we're going to issue something. We're going to clear this up. You know, forthcoming is, is more guidance and then years go by. For example, at JA 14 in order to inform licensees and interested stakeholders, this is the 2012, you know, specific guidance is under development. This will be shared once it's been finalized and four years go by. And then there's the 2016 and then 2016 talks about, I think similarly further clarification. Anyway, you get the picture and then, you know, and then, and then there's a meeting and they just sort of keep saying like, we're going to think about this and it just years and years go by. So I just thought that was something about the industry or about what's going on that isn't apparent to, from the past. I can't necessarily give a comprehensive answer as to why things take the length of time they do. One thing I can point to though is that the NRC has actually endeavored here to be to improve its processes, to listen to interested parties. And you know, one of the things we point out in our brief is that when any, I wrote this letter, the agency said, Hey, you know what? We'd like to get the views of interested parties. And yes, I think, I mean, I think that's a desirable means of governing. But the flip side of it is that it can take time to arrange this, to hear what licensees have to say and not just licensees, but other stakeholders might have to say. And regrettably, the process may take months, years, and we find ourselves in a situation where we're in. But I do think that the agency has endeavored to fix a problem. It began that in 2012, when it realized that there was a mismatch between what licenses licensees were doing under 2002 and what some of its original legal analysis had suggested. And since 2012, it has been endeavoring to issue as much clarity as it can about what it was doing. And I certainly think that as of 2016, the regulated community was on notice that as an NRC licensee, if you want approval to do this, you have to go to the NRC rather than to agreement states. My colleagues have any more questions. All right. Let's talk to you over a long time. Thank you. All right. And Mr. Polly, we'll give you two minutes to rebuttal. Yes. Thank you. So first to disposal, I'd like to draw attention to, this is in response to judge Pillard's question. It's important that disposal is defined under the AEA itself. We cite this at page nine. The language is the term disposal means the permanent isolation of low level waste pursuant to the requirements established by the NRC under applicable laws or by an agreement state. If such isolation occurs in such agreement state. So there's no question that the regulation of course is consistent, but the statute itself defines disposal. What's the site for that? It's the same statute. It's 42 USC 2021 little B sub seven. As my clock is rapidly, I'm going to, I'm going to do speed, speed bullets here. With respect to your question, judge, a lot about footnote four of the government's brief. Those are not two exceptions. Both of those exceptions involve interstate arrangements.  Not an agreement state. There's, there were questions about that. So our, our, our beef here is the narrow one intrastate disposal. And there's no question that intrastate disposal is governed by agreement state agreements. I want to correct something that with due respect, I think the government misstated or overstated. 22,002 is not the regulatory framework here. Yes. There are many parts of part 20, of course, that are, that govern reactors. Of course, but that, but, but low level land disposal is not one of them. Instead, it is one 50.10, one 50.10 says, if you, if you are, if you are in an agreement state and the NRC has consummated an agreement, you know, again, a robust process, you can dispose pursuant to state approval only. But only if you have quantities, not sufficient to form a critical mass. And the commission says that's not what we're talking about here. No, that's no, no, no. It's definitely what we're talking about here. Critical mass, the, the, the NRC critical mass. This is serious stuff, hot stuff. This is not, this is not left to the states. The NRC doesn't have, doesn't have to give the state's permission to regulate disposal sites. The states already have that. What they're disavowing is regulatory authority over low level waste disposal by definition. That's not critical mass. We're talking about protected clothing and, you know, soil and sediment, and algae. It's not, this is, you know, as in the scheme of things, this is not, this is not at the core of, of, of NRC's jurisdiction and never has been. With the court's permission, I'd just like to kind of sum up. So there's a, there's a, there's a right-hand left-hand problem here, and I don't want to bash on the NRC. It's a good commission. The agency, you know, generally speaking, the industry has a good relationship with it, but they're, they're, they're, they're proceeding not in a coordinated way. It's not just the 2009 guidelines on the agency's website today. It says we disavow regulatory jurisdiction pursuant to agreement, state agreements. That's what it says today. So there's just, there's just a lack of coordination going on, you know, within the agency and industry's confused. The AEA is the relevant standard here. It says, if you're going to claw back, if you're going to reclaim, you do so through process and something that is titled a summary, summarizing something that's titled a clarification, all of which on the substance speaks to interstate arrangements. And we have no dispute that is not, that is not good enough under the AEA or the APA or the back. But let me ask you, I'm having a little bit of a trouble grasping where the disagreement is in the sense that Mr. Auerbach Auerbach says, we're not talking about putting it in the ground. You're saying we're only talking about putting it in the ground. Do you disagree that the commission can retain a, a regulatory jurisdiction to look at and sign off on how the NRC licensees plan to package, to transport and choose which authorized facility they're sending stuff to in the case of an alternate site that the state will sign off on. They just want to know about, because the alternate site is, is by its nature more ad hoc. They want to know what did the state sign off on? They're not going to second guess it, but they just want to know. So I want to make sure I'm tracking the court's question. So transportation packaging. Yes, there's no, there's no disagreement. The alternate site. It's not, I mean, in the, in the real world, what we're talking about is municipal sites, record sites, right. Sort of. Right. So, so it's, I don't believe the government is arguing in this case. They just want to know they are saying we have reclaimed authority over the disposal over to overdisposal because they have already ceded to the states. This continues. It's not only the word of the regs, it's the word of the statute. They have already ceded regulatory authority over dumping in the hole to the states. So I don't, my client is unfamiliar with this distinction between disposal and disposal procedure. And, and, and the government's brief, with due respect, it doesn't provide citations for that, for that distinction. So I don't know what, you know, I can't speak to what that, what that might mean, but we don't agree to your question that the NRC just wants to know, or has authority over, you know, what I'm going to call turning the shovel over. And they have given that authority up again, only in agreement state, you know, situations, of course, because they have decided that state law, state regulations often promulgated in connection with the agreement state agreement are good enough. And there's no reason to think there's no reason to think they are not. And the NRC is not arguing that they're not. Have I been responsive? Yeah. I'm a little bit confused about, I have to say what, what the commission is claiming and what it's not claiming with respect to what goes on from, with respect to what's anticipated to go on at the dump. We share that uncertainty. Are there any further questions? All right. Thank you to both council. We kept you both way over your time and we had lots of questions and a lot of information. So we're grateful to both of you for your assistance. The case is submitted.
judges: Millett, Pillard, Ginsburg